[No. 54834-4-I. Division One. April 17, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN A. WHITAKER, *Appellant*.

200

*Philip A. Talmadge* and *Emmelyn Hart-Biberfeld* (of *Talmadge Law Group, P.L.L.C.*); *John R. Muenster* (of *Muenster & Koenig*); and *Day H. Bon*, for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Seth A. Fine* and *Mary K. Webber, Deputies*, for respondent.

---

¶1 BECKER, J. — John Whitaker was convicted of aggravated murder and conspiracy to commit first degree murder. He was convicted for his participation in the kidnapping and killing of Rachel Burkheimer in Snohomish County and sentenced to life in prison without the possibility of parole.

¶2 With respect to the primary issues he raises on appeal, we hold that despite extensive local publicity about the murder, no change of venue was called for; Whitaker upon arrest was properly advised of his right to counsel before he gave an incriminating statement; the trial court did not err in admitting an out of court statement by a coconspirator; and Whitaker did not preserve his claim that the "major participant" language in the aggravating factor instructions needed further definition. Whitaker had a fair trial, and we affirm his conviction and sentence.

## FACTS

¶3 According to the State's evidence, John Whitaker helped his friend John Anderson and several others kidnap and kill Anderson's ex-girlfriend, Rachel Burkheimer, in September 2002. Whitaker helped to bind, hide, and transport Burkheimer. He helped to dig her grave, rob her, bury her, and destroy evidence of her murder.

¶4 Anderson and Whitaker were part of a group who called themselves the Northwest Mafia. The group, led by Yusef Jihad and Anderson, made money by selling drugs

and robbing people. Whitaker was third in command, followed by Matthew Durham, Maurice Rivas, Tony Williams, and Matt Barth. Jihad made it clear that disloyalty to the group would be met with violence.

¶5 At one time, Whitaker and Anderson had lived with J.J. Brazwell. Brazwell moved out and then began dating Burkheimer. Anderson, her ex-boyfriend, was angry and jealous. Anderson and his friends decided that Brazwell was their enemy.

¶6 Burkheimer was still associating with members of the group. Word eventually reached Anderson and Jihad that Burkheimer was discussing the group's criminal activity with Brazwell and others. A day before she disappeared, Burkheimer invited Anderson and Jihad to a party. They became convinced that Burkheimer had tried to lure them to the party so Brazwell could kill them.

¶7 Jihad and Anderson decided to confront Burkheimer. The next day, they learned that she was with two of the group's members, Durham and Rivas, at another friend's house. They ordered Durham and Rivas to bring Burkheimer to the duplex where Jihad, Anderson, Whitaker, and several of the others were staying. Burkheimer came willingly.

¶8 When Burkheimer arrived at the duplex, Anderson became angry. He punched Whitaker and Barth, who were laughing with Burkheimer. This nearly provoked a gunfight with Barth. Burkheimer tried to leave. Anderson threw her to the ground and punched her. Other members of the group turned up the music volume to drown out Burkheimer's screams. Whitaker helped to bind her feet, hands, and mouth with duct tape. He kicked her. Whitaker and Anderson carried Burkheimer into a freestanding garage next to the duplex.

¶9 The group held Burkheimer in the garage, bound, while various members of the group used cocaine and marijuana and discussed what to do with her. They considered ransoming her. Jihad said they should kill her, point-

ing his gun at her. Jihad threatened the others that "Loose ends get cut off," and told Durham and Rivas they could not leave. This went on for several hours.

¶10 The group was startled into action when Jihad's girl friend Trissa Conner—who owned the duplex—came home. She demanded to be let into the garage. When eventually let in, Conner tried to free Burkheimer. After Anderson forced Conner to leave the garage, she threatened to call the police. Jihad convinced her not to do so. Back in the duplex, Conner ordered the group to leave. Two of the men left.

¶11 Anderson was still trying to decide what to do with Burkheimer. Within earshot of Whitaker, Anderson said he could not strangle Burkheimer because he used to love her. Whitaker, Barth, and Jihad discussed planting Burkheimer's car at Brazwell's home. Whitaker then grabbed a large duffle bag and removed its contents. He took the bag into the garage. Someone forced Burkheimer into the bag, and Anderson and Whitaker carried the bag to Durham's Jeep.

¶12 Durham, Rivas, and Whitaker filled Durham's Jeep with gas and drove off, with Burkheimer still inside the duffel bag. Whitaker directed them where to go, following instructions he received over the telephone from Anderson and Jihad. They drove to a wooded area, offloaded the bag, and left Rivas there to watch Burkheimer while they went back to pick up Anderson. Rivas unzipped the bag and spoke with her. Convinced the men would kill her, Burkheimer asked Rivas to make sure they did not drown her.

¶13 When Whitaker and Durham returned with Anderson, they brought shovels and picks from the duplex. Durham drove the Jeep to a remote gravel pit east of Gold Bar. On Anderson's orders, Rivas, Whitaker, and Anderson dug a shallow hole. They brought Burkheimer to the hole. Anderson ordered her to disrobe, to remove her jewelry, and to get into the hole. Whitaker collected her belongings; Anderson shot Burkheimer several times, killing her.

¶14 Whitaker, Anderson, and Rivas buried the body. They returned to the duplex and left Anderson there. Anderson ordered them to get rid of the gun and Burkheimer's things. Whitaker, Rivas, and Durham parked Burkheimer's car at Brazwell's house. Rivas and Durham dropped Whitaker off, then disposed of the other evidence in the car. Whitaker helped several of the others to clean the duplex. They burned a carpet they believed had evidence of the attack. They discussed alibis and leaving town.

¶15 The investigation into Burkheimer's disappearance eventually led to the duplex. Whitaker, Barth, and Jihad began living in hotels, then left for California. They were arrested in Los Angeles. Whitaker made incriminating statements to two Federal Bureau of Investigation (FBI) agents and later to a jail informant, Christian White.

¶16 The State charged Whitaker with aggravated first degree murder and conspiracy to commit murder. The State also charged seven of the other men involved, five of whom pleaded guilty. Whitaker's was the final case to go to trial. He testified at his trial and claimed his actions were motivated solely by fear of Anderson. He denied kicking or binding Burkheimer and denied directing Durham and Rivas where to go once they left with Burkheimer in the bag. He said he tried to convince the men several times to let Burkheimer go. He said he tried to leave the murder site but was ordered to stay by Anderson, who was armed. He said he was too upset to help bury the body. A jury found Whitaker guilty as charged. He appeals the conviction and sentence.

## MOTION TO CHANGE VENUE

¶17 Whitaker moved for a change of venue. He argued that it would be impossible to seat an impartial jury in Snohomish County because of inflammatory pretrial publicity.

¶18 The State contends Whitaker failed to preserve this issue because after initially making the motion, he did not renew it. However, the trial court raised the issue again

sua sponte just before opening statements. The court mentioned that the motion was still pending and denied it. We conclude the issue was adequately preserved for review.

¶19 Due process requires that the accused receive a trial by an impartial jury free from outside influences, including prejudicial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966).

¶20 When a defendant shows that pretrial publicity has created a probability of unfairness or prejudice, a presumption arises that courts should reject claims by potential jurors that they can be impartial. Courts must examine the totality of the circumstances to determine whether such a presumption arises. The relevant question is not whether the community remembered the case but whether the jurors at the trial had such fixed opinions that they could not judge impartially the guilt of the defendant. *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). The decision to grant or deny a venue motion is reviewed for abuse of discretion. *Jackson*, 150 Wn.2d at 269.

¶21 In *Irvin*, a "pattern of deep and bitter prejudice" was shown to be present throughout the Indiana community, which was "clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box." *Irvin*, 366 U.S. at 727. Before the trial began, 8 out of Irvin's 12 jurors already thought he was guilty, although each juror seated promised to "be fair and impartial." The Supreme Court reversed the conviction. "Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Irvin*, 366 U.S. at 728. Whitaker contends that the trial court here likewise failed to apprehend a probability of prejudice from the pretrial publicity.

¶22 Appellate courts must independently review the record to determine whether the probability of prejudice

is so apparent that it constitutes error to deny the motion for a change of venue. *State v. Thompson*, 60 Wn. App. 662, 669, 806 P.2d 1251 (1991). Appellate courts examine nine nonexclusive factors to determine whether the trial court abused its discretion:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Crudup*, 11 Wn. App. 583, 587, 524 P.2d 479 (1974). Because each case is factually unique, previous cases applying the factors are helpful but not dispositive. *State v. Rice*, 120 Wn.2d 549, 556, 844 P.2d 416 (1993).

¶23 Whitaker contends the court failed to give enough weight to the factors that favored a change of venue. He relies on factors (1) inflammatory nature, (2) degree of circulation, (3) timing of publicity, and (7) connection of government officials.

¶24 The trial court agreed with Whitaker that factors two and three—the widespread circulation of the news accounts and the short period of time between the publicity and trial—weighed in support of the motion to change venue. With respect to the seventh factor, the court found no significant connection of state agents with the release of the publicity. Most of the accounts were based on generally available information. Whitaker cites statements police gave to news media during the investigation and interviews given by prosecutors. But he has not shown that any such statements or interviews were inflammatory rather than informational. Whitaker places great emphasis

upon the county prosecuting attorney's comment, reported in the newspaper, that the case "touched a nerve" in the community. This phrase was circumspect, not inflammatory. The trial court correctly concluded that the involvement of state agents with pretrial publicity was insufficient to weigh in support of a venue change.

¶25 With respect to the first factor, the trial court concluded that the pretrial publicity was "informational and not inflammatory in nature" and that the "nature and circumstances of the crime are the cause of public interest, not the nature of the publicity." The record shows that this was true for the most part, but Whitaker is correct that some of the pretrial publicity went beyond merely providing information. Two newspaper editorials lamented the senselessness of the murder; other articles detailed the grief and frustration experienced by Burkheimer's family; still others showed Whitaker's attempt to get one of the witnesses disqualified by claiming he was married to her, a claim the court ultimately rejected.

■ ¶26 However, as set out in *Jackson*, the relevant question is not simply the existence of inflammatory publicity, but rather the effect of that publicity upon potential jurors. In *Jackson*, the Washington Supreme Court emphasized the importance of the trial court's care in empaneling a jury:

> although the publicity was at times extensive, and some of it inflammatory, and the great majority of the veniremen had heard of the case, the care taken by the trial court to ensure an impartial panel leads us to conclude that the Court of Appeals correctly found no abuse of discretion.

*Jackson*, 150 Wn.2d at 270. The best way to find out if the jurors have opinions so fixed that they cannot be impartial is to attempt to empanel a jury. In *Jackson*, the court found it significant that Jackson had been given the opportunity for in camera questioning of each prospective juror. On appeal, Jackson had not identified "any specific members of the seated jury or the alternates as being biased." *Jackson*, 150 Wn.2d at 272.

■ ¶27 *Jackson* shows that a trial court's extreme care in selecting a jury can prevent inflammatory publicity from being a concern. Like in *Jackson*, Whitaker's trial judge took great care to ensure an impartial jury. One hundred and five potential jurors were in the pool at the beginning. Before personally interviewing any of them, the judge warned the group at length, and more than once, about the unreliability of media accounts, e.g.:

> Please keep in mind that media reports are based on hearsay sources, and not upon firsthand interviews with witnesses under oath; that media reports are not tested by the presumption of innocence standard, or proof beyond a reasonable doubt standard; and that media reports generally make no distinction between the eight men charged with this crime. You don't necessarily know whether what you have seen, read or heard relates to Mr. Whitaker or to one of the other men accused in this crime.[1]

Eighty-three potential jurors underwent in camera questioning based on their answers to the jury questionnaire.

¶28 After personally interviewing jurors, the court found that the jurors were aware of the death but not of Whitaker's involvement in it:

> A large number of the prospective jurors were familiar with the case. However, many knew little more than that a young woman had been missing and later found dead. In general, the prospective jurors did not know John Whitaker's name or how he related to the case.

The court granted all but two of Whitaker's for-cause challenges. Whitaker was able to exercise peremptory challenges for both of those jurors.

¶29 The record reflects that Whitaker's prospective jurors had little awareness of the publicity and the details of the crime. Given the scrupulous care taken by the trial court, the circumstances considered in their totality do not show a probability of unfair prejudice sufficient to raise the presumption that the jurors' declarations of impartiality

---

[1] Report of Proceedings (May 25, 2004) at 10.

should be distrusted. The trial court did not abuse its discretion in denying the motion for change of venue.

## STATEMENT TO FBI AGENTS

¶30 In Los Angeles, two FBI agents conducted a custodial interrogation of Whitaker after obtaining his waiver of his rights to remain silent and to have an attorney. Whitaker contends his waiver was invalid because it was coerced and the incriminating statements he made during the interrogation should therefore have been suppressed. As Whitaker describes the scene, he "was a young man in an intimidating setting in Los Angeles: he was handcuffed, he was being held in the Sheriff's Department detective bureau, and he was being interrogated by veteran FBI agents."

¶31 Whitaker assigns error to the order entered by the trial court after a CrR 3.5 hearing. Because he does not assign error to the findings, they are verities on appeal. *State v. Earls*, 116 Wn.2d 364, 372 n.3, 805 P.2d 211 (1991). The trial court found that a Snohomish County arrest warrant was issued for Whitaker while he was in California. A Snohomish County detective asked FBI agents in Los Angeles to help find and arrest Whitaker. Two FBI agents were present when the Los Angeles County Sheriff's Department arrested Whitaker on the warrant. At the request of the county detective, the FBI agents interviewed Whitaker two hours later at the Sheriff's Department in an interview room.

¶32 Whitaker was handcuffed during the interview, although the agents removed the handcuffs from one hand so Whitaker could write. The agents explained why they were there, told Whitaker the charges he faced, and told him where those charges were filed. They explained the extradition process and informed Whitaker about his constitutional rights.

¶33 Whitaker waived his rights and signed a waiver form. He wrote a statement and gave oral statements. In these statements, he admitted that he may have helped to

place Burkheimer in the bag, to carry her in the bag to the truck, to dig her grave, and to bury the body. He reviewed his written statement and made some changes.

¶34 Both the fifth and sixth amendments to the federal constitution (and their state counterparts) include guaranties of the right to counsel. The Fifth Amendment prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the accused that he has the right to remain silent and the right to the presence of an attorney. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). However, the person being interrogated may validly waive the right to counsel. *Miranda,* 384 U.S. at 475. If the interrogation takes place without an attorney present, the State has the heavy burden of establishing the defendant's waiver of his privilege against self-incrimination and his right to re-tained or appointed counsel. This burden is met if the State can prove the voluntariness of the statement by a prepon-derance of the evidence. *Earls,* 116 Wn.2d at 378-79.

¶35 To be valid, the Fifth and Sixth Amendment waivers must be voluntary, knowing, and intelligent. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (Fifth Amendment); *Patterson v. Illinois,* 487 U.S. 285, 292, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988) (Sixth Amendment). Validity of a waiver de-pends upon the particular facts and circumstances sur-rounding that case, including the background, experience, and conduct of the accused. *Edwards,* 451 U.S. at 482. Absent coercion, a suspect's Fifth Amendment waiver is valid as a matter of law when the State shows he knew he could remain silent and request an attorney, and he under-stood that the State could use his statements against him. *State v. Corn,* 95 Wn. App. 41, 59, 975 P.2d 520 (1999). The same analysis applies with respect to a waiver of the Sixth Amendment right. *See Patterson,* 487 U.S. at 292-93.

¶36 Whitaker both signed and wrote statements indicat-ing he understood his rights. He reviewed his written

statements and made some changes. While he was writing the statements, the agents were in and out of the interview room. Whitaker appeared awake, alert, and sober. He asked questions about the extent of his rights and was neither threatened nor promised anything in exchange for his waiver.

¶37 Whitaker had at least one hand handcuffed during the interview. But as the trial court concluded, that fact did not establish coercion per se. And Whitaker was not so young at age 22 as to be incapable of waiving his rights. *See State v. Jones*, 95 Wn.2d 616, 625, 628 P.2d 472 (1981). There, a 15-year-old Canadian boy who was charged with second degree murder waived his *Miranda* rights and gave a custodial statement. The boy testified he had only once visited this country, had dropped out of high school in the 10th grade, and did not understand the rights read to him. However, he had signed an appropriate waiver form, he appeared to be of normal intelligence and understanding, and his answers were responsive to the interrogator's questions. The *Jones* court affirmed the trial judge's ruling that the boy understood his rights. Similarly here, Whitaker's youth is not a basis to discount the trial court's determination that he was capable of waiving his rights.

¶38 Whitaker also contends the FBI agents "affirmatively misrepresented" his right to counsel. At some point during the time the agents were advising Whitaker of his rights, he asked "when he could talk to an attorney." The agents asked Whitaker whether he had an attorney or he would need an appointed attorney. Whitaker replied that he was talking about "when in the process an attorney would be appointed" for him.

¶39 The agents told Whitaker the court "would deal with this" when he went to court the next morning. Whitaker contends this was the misrepresentation. If this had been the agents' only response to his inquiry, we might agree. But the agents also told Whitaker he could request an attorney "at that moment." They clearly stated that if he asked for an attorney all questioning would stop. Whitaker

chose not to ask for an attorney and instead waived his rights. After the colloquy reflected in the court's findings, Whitaker could not have reasonably believed that he did not have the right to counsel at that moment. We find no error in the trial court's conclusion that Whitaker's waivers of his Fifth and Sixth Amendment rights were voluntary, knowing, and intelligent.

¶40 Whitaker finally argues that the agents deprived him of his right to counsel by violating a court rule. The rule in question provides:

> At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer.

CrR 3.1(c)(2). Whitaker contends this rule applies to federal agents in California by virtue of an alleged agency relationship between the Snohomish County detective and the FBI interrogators. Assuming the rule does apply, we conclude the FBI interrogators did not violate it. The rule applies only to a person "who desires a lawyer." The court's findings make clear that Whitaker did not express a desire to have a lawyer on hand before or during the interrogation. He asked a question about the process by which a lawyer would be appointed.

¶41 Whitaker's question might have been understood as an equivocal invocation of his right to counsel. When an invocation is equivocal, interrogators are generally allowed to ask questions clarifying the suspect's request. *See State v. Robtoy*, 98 Wn.2d 30, 38, 39, 653 P.2d 284 (1982) ("Otherwise, the mere mention by the suspect of the word 'attorney' takes on talismanic significance."). The agents sought to clarify Whitaker's question by explaining that he could ask for an attorney any time and if he did so, all interrogation would stop. Because Whitaker did not respond to that offer, he made it clear that he was willing to be questioned without invoking his right to communicate

with a lawyer. We conclude there was no violation of CrR 3.1(c)(2).

¶42 Because Whitaker validly waived his constitutional rights, the court properly ruled his statements admissible.

## CHRISTIAN WHITE'S TESTIMONY

¶43 At trial, over Whitaker's objection, the court allowed jail informant Christian White to testify about conversations he had with Whitaker when they were housed in neighboring cells at the jail. According to White, Whitaker told him he had kicked Burkheimer in the head just after Anderson first attacked her. According to White, Whitaker also said he did not try to stop Anderson from shooting Burkheimer because he wanted to see what it was like to see someone murdered. White said Whitaker told him he was going to claim at trial that he was afraid of Anderson on the day in question and would try to convince his codefendants to lie at trial to the same effect.

¶44 Whitaker contends the State made White an agent for the purpose of getting incriminating statements from Whitaker without counsel being present. Therefore, he contends, admission of White's testimony violated his Sixth Amendment right to counsel.

¶45 The prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the Sixth Amendment right to counsel. *Maine v. Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. *Moulton*, 474 U.S. at 176. Knowing exploitation by the State of an opportunity to confront the accused without counsel being present violates the right to counsel. *Moulton*, 474 U.S. at 176.

¶46 The fact that an inmate has an existing relationship with law enforcement, has previously been an informant, or has received some benefit for reporting a

defendant's statements may be evidence of his status as a government agent. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 911, 952 P.2d 116 (1998). But none of these factors is dispositive. The informant's understanding from past conduct as an informant that cooperation with the authorities may prove beneficial does not necessarily make the informant an agent. For there to be an agency relationship, there must be at least an implicit agreement between the parties with respect to the current undertaking and the principal must have the ability to control that undertaking. *Benn*, 134 Wn.2d at 912.

¶47 After Whitaker moved to suppress information gained from White, the court conducted a hearing to decide whether White was a state agent. In deciding that he was not, the court relied on testimony by Detective Pince and transcripts of Pince's interviews with White.

¶48 Detective Pince testified that White was housed next to Whitaker at the jail while awaiting trial on third degree assault charges. White had known Whitaker for years and befriended him in jail by protecting him. White had approached another officer, seeking to give information about the Burkheimer case and another case. The officer referred White to Detective Pince. On February 7, 2004, White met with Detective Pince to tell him things he had heard about two cases, one of which was Whitaker's. During this first meeting, White told the detective much of what he testified to at Whitaker's trial. White hoped to get favorable consideration from the prosecutor's office. He offered to get more information, but Detective Pince told him not to try. Detective Pince told White he would present the information to the prosecutor's office, who would decide whether a deal could be worked out.

¶49 Later, White sent a letter to Detective Pince indicating he had more information. He said he knew he was not supposed to be looking for information but he accepted it freely when it came to him. He concluded by mentioning his upcoming trial date and asking what Detective Pince's plan was. After receiving this letter, Detective Pince and a

prosecuting attorney met with White again on February 26. At the interview, White said Whitaker was arranging with one of his codefendants to testify falsely that Whitaker was afraid of Anderson. White acknowledged there had been no agreement between him and the State to get more information and that he had been told not to do so. White admitted, though, that once Whitaker began telling him things, White encouraged him to say more. Detective Pince testified that this information had caused him to reinterview Maurice Rivas, who testified at trial that he was contacted by Whitaker through another person with instructions on how to testify.

¶50 Detective Pince testified that he had no implied agreement with White. At their first meeting on February 7, White told him he hoped to be released from jail pending his trial in exchange for the information. This hope went unfulfilled. Detective Pince said he stressed to White that the reason he was recording the February 7 statement was because he did not want any more information from White other than what he had already received at that meeting. Detective Pince testified that logistical problems and time constraints prevented him from having White moved to another cell. He said the jail was overwhelmed with the Burkheimer case because so many people already needed to be kept separate.

¶51 Whitaker withdrew his motion to exclude information collected from the February 7 interview with White, acknowledging there was no evidence White was an agent at that time. However, he argued the court should exclude the fruits of White's second interview: evidence that Whitaker was trying to convince Rivas to lie on his behalf. The court found no implicit agreement:

> it would have been best if Detective Pince had arranged at that time for Mr. White to be moved to a different housing unit in the Snohomish County Jail so he would not have been able to have further contact with Mr. Whitaker. However, even though this was not done there is no evidence to suggest that the failure was because of some hope or intention that Mr. White

would continue to try to get information from Mr. Whitaker. There's nothing to suggest that Detective Pince was in any way trying to undermine or suggest that his plain language, indicating that Mr. White was to do nothing more, meant anything other than exactly what he was saying. As I said, it's unfortunate that Detective Pince didn't have the opportunity right then to make arrangements. I think it's clear from Detective Pince's own testimony that he would have preferred to have done something immediately, in retrospect.

. . . I'm also persuaded by the testimony that Mr. White did not make any actual effort to obtain that information.

The court denied the motion to suppress the fruits of White's second interview.

¶52 Proof that the State "must have known" that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to show a Sixth Amendment violation. *United States v. Henry*, 447 U.S. 264, 271, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). Whitaker contends White was a state agent because the State, like in *Henry*, must have known that White would seek out more information from Whitaker.

¶53 In *Henry*, a defendant was incarcerated pretrial on a bank robbery charge. Nichols, a regular government informant, was incarcerated near Henry. An agent told Nichols to be alert to anything Henry (and others) said but not to initiate any conversation with Henry regarding the bank robbery. The agent later contacted Nichols, who said he and Henry had spoken about the robbery. The FBI paid Nichols for the information, and Nichols testified at Henry's trial about what Henry told him. Henry's conviction was reversed on appeal based on the violation of his Sixth Amendment right to counsel. The Court set out three important factors leading to this conclusion: (1) Nichols was acting under instructions as a paid government informant; (2) Nichols was ostensibly no more than a fellow inmate of Henry; and (3) Henry was in custody and under indictment at the time he was engaged in conversation by Nichols. "Even if the agent's statement that he did not intend that

Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Henry*, 447 U.S. at 271. The Court was untroubled, however, by the testimony of another of Henry's cellmates, who was not a paid informant and had no arrangement to monitor or report on conversations with Henry. *Henry*, 447 U.S. at 267 n.3.

¶54 The paid informant in *Henry* had been told to listen to everything Henry said and was paid according to an existing agreement. White, by contrast, was told not to seek out information and was promised nothing (though he eventually made a plea deal). The court believed Detective Pince's explanation for why White was not moved to a different area in the jail. The trial court's conclusion that Detective Pince acted in good faith is supported by the hearing testimony. Moreover, like in *Benn*, there was neither an implicit agreement nor any evidence that Detective Pince could control White. White directly contradicted Detective Pince's instructions. Whitaker's arguments to the contrary are essentially invitations to revisit the trial court's credibility determinations. This we cannot do.

## COCONSPIRATOR STATEMENTS

¶55 Whitaker contends certain out-of-court statements by Jihad and Anderson should not have been admitted because they were hearsay. The State responds they were not hearsay and were properly admitted as statements by coconspirators.

¶56 An out-of-court assertion offered for the truth of the matter asserted is not hearsay if offered against a party and made by a coconspirator of that party "during the course and in furtherance of the conspiracy." ER 801(d)(2)(v). Before admitting statements under this rule, the trial court must make an independent determination that a conspiracy existed and that the defendant was a member of the conspiracy. *State v. Halley*, 77 Wn. App. 149, 152, 890 P.2d 511

(1995). Both must be shown by substantial evidence independent of the statements the State seeks to admit and must be established by a preponderance of the evidence. *State v. St. Pierre*, 111 Wn.2d 105, 118, 759 P.2d 383 (1988).

¶57 The State need show no more than the basic dictionary definition of a conspiracy: " 'an agreement . . . made by two or more persons confederating to do an unlawful act,' " regardless of the crime charged. *Halley*, 77 Wn. App. at 154 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 485 (1969)). A conspiracy may be shown by circumstantial evidence. It is not necessary to show a formal agreement. A concert of action, all the parties working together understandingly with a single design for the accomplishment of a common purpose, will suffice. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997).

¶58 Whitaker moved in limine to exclude coconspirator hearsay. He argued that the State would be unable to establish the necessary foundation. The court reserved ruling until trial and asked the prosecutor to come up with a list of the statements for which he believed the coconspirator exception was necessary for admission.

¶59 At trial, several members of the group testified as to what happened to Burkheimer in the duplex. At one point, during Rivas's direct examination, the prosecutor indicated he sought to use the coconspirator exception to elicit from Rivas two damaging statements by Jihad, who, along with Anderson, was unavailable at trial. Whitaker objected strongly to the admission of one statement, which Jihad made when Rivas arrived at the duplex and saw what was going on in the garage. Jihad told Rivas he was "in this now" and told him also (among other things) that Whitaker had kicked Burkheimer. After hearing extensive argument, the trial court found the statement was not hearsay because Jihad was Whitaker's coconspirator.

¶60 A court's evidentiary rulings are reviewed for abuse of discretion. *State v. Davis*, 141 Wn.2d 798, 841, 10 P.3d 977 (2000). Whitaker contends the record does not

contain substantial evidence to establish independently that at the time Rivas arrived at the duplex, a conspiracy existed and Whitaker was a member of it.

¶61 The court identified the following evidence as constituting the necessary foundation: (1) Anderson knocked Burkheimer down in the presence of several other people, including Whitaker; (2) Whitaker kicked her; (3) Williams turned up the music and got duct tape; (4) Whitaker assisted in taping Burkheimer; (5) Burkheimer was carried into the garage; (6) the individuals who were present were in and out of the garage; and (7) they all discussed what to do next. These facts are all supported by firsthand nonhearsay testimony at trial, all of it admitted into evidence before the hearing on Whitaker's motion to exclude. Christian White's testimony, which the court had already ruled admissible at that time, provided additional independent evidence that Whitaker kicked Burkheimer. The independent evidence relied on by the court sufficiently demonstrates a concert of action, with the various members of the group working together toward the single design of holding Burkheimer against her will. And it also sufficiently demonstrates that Whitaker was a member of the conspiracy.

¶62 Whitaker next contends the trial court decided the issue of his participation in the conspiracy using the wrong evidentiary standard.

¶63 In preparation for ruling on Whitaker's motion, the trial court reviewed *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984) and *State v. Guloy*, 104 Wn.2d 412, 419-20, 705 P.2d 1182 (1985). *Dictado* states that prior to admitting coconspirator statements, the trial court "must determine whether the State has shown, with substantial independent evidence, a prima facie case of conspiracy, and at least slight evidence of defendant's participation." *Dictado*, 102 Wn.2d at 283-84. However, *Guloy* made clear that *Dictado* is no longer good law for the proposition that slight evidence of the defendant's participation is sufficient. The proper standard is not slight evidence but a preponderance of the evidence. *Halley*, 77 Wn. App. at 152 n.5.

¶64 The trial court's oral ruling referred to *Dictado*'s "slight evidence" language:

First of all, I've already stated for the record that I am persuaded there is substantial evidence that there was a conspiracy at this time to kidnap Rachel [Burkheimer]. And that it was a continuing conspiracy. And then ultimately that conspiracy becomes a conspiracy to kill Rachel, and afterwards continues for purposes of disposing of evidence. In addition, *as stated in* Dictado,[2] *it requires at least slight evidence of the defendant's participation.* I would say based on the evidence available to the Court there is certainly more than slight evidence of Mr. Whitaker's participation in the kidnapping and later in the murder of Rachel Burkheimer. So I think that issue is established.[3]

Whitaker contends this excerpt from the court's ruling shows that the court committed reversible error by using the wrong standard.

¶65 The court's reference to "more than slight evidence" as opposed to "preponderance of the evidence" does not require reversal. As the State points out, the trial court in *Guloy* made no determination at all as to whether the defendant was a member of the conspiracy. The Supreme Court made its own determination that the record contained substantial evidence on that point. Our review of the record in this case similarly shows there was substantial evidence of Whitaker's participation at the duplex in the plan to hold Burkheimer against her will.

¶66 Finally, an erroneous evidentiary ruling is harmless unless, within reasonable probabilities, it affected the outcome of the trial. *State v. Thomas*, 150 Wn.2d 821, 870, 83 P.3d 970 (2004). Jihad's statement that Whitaker kicked Burkheimer when she was down was merely duplicative of what Williams and White said. Even if Jihad's statement should have been excluded as hearsay, evidence of the kick was before the jury. Any error was harmless.

---

[2] *Dictado*, 102 Wn.2d at 284.

[3] Report of Proceedings (June 9, 2004) at 1209-10 (emphasis added).

*CRAWFORD*

¶67 Whitaker next contends the trial court admitted several testimonial hearsay statements in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). One of his citations is to the portion of the record in which Rivas testifies about Jihad telling him Whitaker kicked and bound Burkheimer. As noted above, the court admitted these statements as statements in furtherance of a conspiracy. Such statements are not barred by *Crawford* because they are not testimonial. *Crawford*, 541 U.S. at 56.

¶68 Whitaker calls attention to portions of the record consisting of Jihad's statements to the police and the FBI. None of these excerpts show that the jury heard testimony about statements made by Jihad to law enforcement. Instead, the transcript shows argument outside the presence of the jury—for example, where the lawyers are arguing about the coconspirator exemption[4] or where defense counsel is seeking to introduce part of Jihad's statement to law enforcement.[5]

¶69 The court had transcripts of Jihad's statements to law enforcement admitted "for my purposes" and had them marked with pretrial numbers. Whitaker offers nothing more than speculation that this evidence reached the jury. Because he has not identified testimonial hearsay that reached the jury, his *Crawford* argument is unsupported.

¶70 At oral argument before this court, Whitaker introduced an argument that *Crawford* prohibits a judge from relying on testimonial hearsay to determine whether coconspirator statements are sufficiently reliable to be admitted under ER 801(d)(2)(v). As he has offered no authority for his late-adopted position, we do not consider it.

---

[4] Report of Proceedings (June 9, 2004) at 1207-09, 1211, 1214.

[5] Report of Proceedings (June 14, 2004) at 1759-70.

GRUESOME PHOTOGRAPHS

¶71 Whitaker moved to exclude 13 autopsy photographs as unfairly prejudicial. He contends the court erred by denying this motion.

¶72 Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect. *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). A bloody, brutal crime cannot be explained to a jury in a lily-white manner. *State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947, 91 S. Ct. 2273, 29 L. Ed. 2d 855 (1971). The State may present "ample evidence" to prove every element of the crime. Even so, prosecutors do not have "carte blanche to introduce every piece of admissible evidence" when the cumulative effect of that evidence is inflammatory and unnecessary. *Crenshaw*, 98 Wn.2d at 807; *see State v. Sargent*, 40 Wn. App. 340, 698 P.2d 598 (1985) (abuse of discretion to admit four autopsy photographs when only one helped to show premeditation, and testimonial evidence and diagrams could have revealed the same information in a nonprejudicial manner).

¶73 The admission of autopsy photographs is in the sound discretion of the trial court. *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991). Photographs have probative value where they are used to illustrate or explain the testimony of the pathologist performing the autopsy. *Lord*, 117 Wn.2d at 870. Unless it is clear from the record that the primary reason to admit gruesome photographs is to inflame the jury's passion, appellate courts will uphold the decision of the trial court. The law requires an exercise of restraint, not a preclusion simply because other less inflammatory testimonial evidence is available. *State v. Stackhouse*, 90 Wn. App. 344, 357, 957 P.2d 218 (1998).

¶74 Here, the State questioned prospective jurors during voir dire regarding their ability to deal objectively with gruesome autopsy photographs. The State proposed to admit 15 out of the 77 available autopsy photographs.

Whitaker objected to 13 of them and argued that admission of the photographs would violate ER 403 because the doctor could explain the autopsy just as well with diagrams. The trial court held a hearing outside the presence of the jury so that Dr. Thiersch, the medical examiner, could identify the relevance of the 15 photographs to his testimony. The doctor said they were representative of the injuries on Burkheimer's body and would help explain the relationships between the various injuries. For instance, the pictures of the face show that the bruising could not have come from only one blow.

¶75 In the doctor's opinion, the death was a homicide caused by gunshot wounds to the head. He said he could explain this opinion with diagrams but they would not convey as much information as photographs. The actual appearance of the wounds was relevant to his determination that the death was a homicide because they suggest the gun was fired from a distance inconsistent with suicide. The appearance of the gunshot wounds also helps to explain which are entrance wounds and which are exit wounds. They show that the injuries occurred near the same time and while Burkheimer was alive. The decomposition and skin slippage helped show that the body had been in a grave for a long time. The appearance of the wounds also helped to establish the direction of the gunfire and to show that Burkheimer was lying face down when killed.

¶76 The court denied the motion to exclude. The court found that the pictures would be more supportive of the doctor's testimony than a drawing telling them what he saw, especially given the jurors' inexperience with what was being represented. The court noted that the doctor's manner was clinical, not inflammatory. The court ruled that while the decomposition of the body made the pictures more disturbing to look at, that was a fact of the case. The court found the photographs "extremely useful in explaining Dr. Thiersch's opinions, and in corroborating testimony of other individuals in this case."

¶77 The photographs, which are part of the record, are indeed gruesome and disturbing. But a reasonable person could conclude as the trial court did, that jurors would better understand the doctor's testimony with photographs than they would with diagrams. A medical examiner's testimony that the photographs will be helpful is a factor supporting admissibility. *See, e.g., State v. Elmore,* 139 Wn.2d 250, 285, 985 P.2d 289 (1999) ("it cannot be said the trial court abused its discretion in admitting the autopsy photographs given the medical examiner's testimony that such slides would aid the jury in understanding his testimony"). A defendant may not "sanitize the events of a brutal crime by dictating what evidence of the victim's death the State is entitled to present." *Elmore,* 139 Wn.2d at 285. We conclude the trial court did not abuse its discretion.

## ACCOMPLICE LIABILITY INSTRUCTION

¶78 Whitaker next contends the court's accomplice liability instruction violated the *Cronin-Roberts*[6] rule. That rule requires accomplice instructions to require proof that the defendant knew his actions would promote *the* crime charged, rather than any potential crime.

¶79 The trial court instructed the jury as follows:

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

A person is an accomplice in the commission of the crime of murder in the first degree if, with knowledge that it will promote or facilitate the commission of that crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

This is the language required by *Cronin* and *Roberts*.

---

[6] *State v. Cronin,* 142 Wn.2d 568, 578, 14 P.3d 752 (2000); *State v. Roberts,* 142 Wn.2d 471, 510-13, 14 P.3d 713 (2000).

¶80 Whitaker contends the first sentence, which contains the phrase "a crime," relieved the State of its burden of proving his knowledge of "the" crime. But the first sentence does not relate to the defendant's knowledge. It relates to his location. The instruction does not relieve the State of its burden to prove knowledge of "the" crime.

## FIRST DEGREE MURDER TO-CONVICT INSTRUCTION

██ ██ ¶81 Instruction 12, the to-convict instruction, allowed the jury to convict Whitaker for first degree murder as an accomplice:

> To convict the defendant of the crime of murder in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> . . . .
>
> (2) That the defendant or a person to whom he was an accomplice acted with intent to cause the death of Rachel Rose Burkheimer;
>
> (3) That the intent to cause the death was premeditated.

Whitaker challenges elements (2) and (3) in the court's to-convict instruction for the murder charge. He contends the instruction should have required the State to prove that Whitaker himself had the intent to kill Burkheimer and that his own intent to kill was premeditated.

¶82 A person is guilty of a crime if he is an accomplice of the person who committed the crime. RCW 9A.08.020. A person is an accomplice if, with knowledge that it will promote or facilitate the commission of the crime, he aids another person in committing it. RCW 9A.08.020. An accomplice need not "have specific knowledge of every element of the crime nor share the same mental state as the principal." *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003).

¶83 The to-convict instruction in this case satisfied the statute by requiring the State to prove that Whitaker acted with knowledge he was aiding a premeditated murder.

¶84 As Whitaker points out, the same instruction was held inadequate in *Roberts*. But it was held inadequate for imposition of the death penalty, not for conviction of first degree murder. *Roberts*, 142 Wn.2d at 505. *Roberts*, therefore, does not support Whitaker's argument.

## MAJOR PARTICIPANT

¶85 Both sides raise issues arising out of the court's inclusion of "major participant" language in the instructions that allowed the jury to convict Whitaker of aggravated murder. Conviction for aggravated murder requires proof of an aggravating factor and allows no punishment less than life in prison without possibility of any parole. Here, the State alleged as aggravating factors that the murder was committed in the course of, in furtherance of, or in immediate flight from (1) robbery in the first degree or, alternatively, (2) kidnapping in the first degree. Instruction 15 required the jury to find, as well, that Whitaker himself was a "major participant" in the acts that caused Burkheimer's death:

> If you find the defendant guilty of premeditated murder in the first degree as defined in instruction 12, you must then determine whether any of the following aggravating circumstances exist:
>
> The murder was committed in the course of, in furtherance of, or in immediate flight from robbery in the first or second degree *and the defendant was a major participant in the acts which caused the death of Rachel Burkheimer* and the defendant was a major participant in the robbery in the first or second degree.[7]

The other aggravating factor instruction and the verdict form mirrored this "major participant" language.

¶86 Whitaker appeals the court's failure to define "major participant," something he did not request below, and argues that the term is unconstitutionally vague. The State

---

[7] Clerk's Papers at 105 (emphasis added).

responds that if major participation language is required, Whitaker's argument is barred by invited error. The State also contends major participation language is not required in an aggravated murder case where the State is not seeking the death penalty.

¶87 We reject the State's contention that Whitaker's claim is barred by invited error. The trial court asked both parties to propose a "major participant" instruction. Whitaker's counsel proposed the language used in the court's instruction: "major participant in the acts which caused the death of Rachel Burkheimer."[8] However, Whitaker is not arguing on appeal that it was error to include this language. Rather, he is arguing that once the court decided to include "major participant" language, the court erred by failing to define "major participant."

¶88 Whitaker did not object before the verdict to the lack of definition of the term, nor did he propose a definition. While the constitution requires that the jury be instructed as to each element of the offense charged, definition of those elements is not a constitutional requirement. *State v. Scott*, 110 Wn.2d 682, 689, 757 P.2d 492 (1988). A criminal defendant who feels the prosecution's case is weak on one of the elements may so argue to the jury or advance a well crafted instruction. The defendant may not raise the absence of a definitional instruction for the first time on appeal. *Scott*, 110 Wn.2d at 691.

¶89 The closest Whitaker came to proposing a definition was in arguing that the jury should be instructed to find "that the defendant personally committed the robbery in the first or second degree or personally committed kidnapping in the first degree."[9] But this instruction misstates the law. A requirement that a defendant personally commit the underlying offense would rule out accomplice liability for aggravated murder. *Roberts* did not rule out accomplice liability for aggravated murder. *Roberts* held

---

[8] Report of Proceedings (June 16, 2004) at 2274.

[9] Report of Proceedings (June 17, 2004) at 2295.

that when the aggravated murder to be punished by death is committed via accomplice liability, major participation by the defendant is required. Whitaker's failure to propose a defining instruction that correctly stated the law precludes him from arguing on appeal that the absence of such an instruction was error.

¶90 We further reject Whitaker's contention that we should use a due process vagueness analysis in evaluating his claim that the trial court should have given an instruction he did not request. Vagueness analysis is employed to ensure that ordinary people can understand what conduct is proscribed and to protect against arbitrary enforcement of law. *See City of Bellevue v. Lorang*, 140 Wn.2d 19, 30, 992 P.2d 496 (2000). This rationale applies to statutes and official policies, not to jury instructions. Unlike citizens who must try to conform their conduct to a vague statute, a criminal defendant who believes a jury instruction is vague has a ready remedy: proposal of a clarifying instruction. Following *Scott*, we conclude that Whitaker's failure to propose a definition of "major participant" precludes review of his claim of error.

¶91 The State's appeal urges that instruction 15 imposed upon the State a higher burden than the law requires. The State contends that only in a capital case is the State required to prove that the defendant was a major participant in the acts that caused the death.

¶92 When a jury finds aggravating factors in a murder case and decides to impose the death penalty and the finding of guilt on the underlying murder charge is based on accomplice liability, the jury must find the accused was a major participant in the homicidal acts:

> The "to convict" and aggravating factors instructions were erroneous in conjunction with one another because they "allow a defendant to be sentenced to death without a showing that he or she personally caused the victim's death or was a major participant in the homicidal acts."

*Thomas*, 150 Wn.2d at 842 (quoting *Roberts*, 142 Wn.2d at 506). *Thomas* was procedurally identical to *Roberts*: a jury,

possibly employing accomplice liability, convicted the defendant of aggravated murder when the instructions did not include a major participation requirement, and a death sentence was imposed. The Supreme Court upheld the conviction but reversed the death sentence. The problem then was to define the options available to the trial court on remand.

¶93 The court considered whether Thomas could, on remand, simply be resentenced to life without possibility of parole—the only sentence available, short of death, for an aggravated murder conviction. The court decided a "life without" sentence was not an option and remanded for either a new trial on aggravated murder or resentencing on first degree murder:

> Under *Apprendi*[10] and *Ring*[11] the jury must decide whether the aggravating factors have been proved beyond a reasonable doubt for Thomas to be sentenced to either life in prison without the possibility of parole or death because both of these sentences are more severe than life with the possibility of parole.

*Thomas*, 150 Wn.2d at 849. The court held the omission of the major participant language in the aggravating factor instruction was an error that could not be harmless.

¶94 The conclusion that "major participant" language had to be included in the instructions for Whitaker's aggravated murder case even though no death penalty was sought appears to be compelled by the analysis in *Thomas*. Had the *Thomas* court believed that "major participant" language in the instructions was required only for death cases, Thomas could have been resentenced to life in prison without parole. There would have been no reason to decide whether harmless error was available to affirm the aggravated murder conviction but not the death penalty if no error occurred in the first place.

---

[10] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[11] *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

¶95 We nevertheless acknowledge the persuasive force of the State's argument that it would not have been error to omit the language in this case where the death penalty was not at stake. The cases from which the requirement originates derive it from the Eighth Amendment as that amendment relates to the constitutionality of the death penalty. *See* cases discussed in *Roberts*, 142 Wn.2d at 502-03.

¶96 If the analysis in *Thomas* is flawed, as the State's position suggests, there has been no prejudice to the State in the present case. Even if the burden imposed by instruction 15 was unnecessarily high, the jury found the State met it. In view of our decision to affirm the conviction and sentence, it is unnecessary to decide the State's cross-appeal.

## STATEMENT OF ADDITIONAL GROUNDS

¶97 In a pro se statement of additional grounds for review, Whitaker contends the State's evidence was insufficient to prove either the murder or conspiracy charges. But, when viewed in the light most favorable to the State, the circumstances here show that Whitaker played a major role in nearly every stage of Burkheimer's murder. The evidence is sufficient.

¶98 The jury was instructed that a person is not an accomplice if he terminates his complicity prior to the commission of the crime and makes a good faith effort to prevent the commission of the crime. In an effort to prove that he made a good faith effort to prevent the killing, Whitaker testified that he asked Anderson not to kill Burkheimer. In closing, the prosecutor argued that Whitaker's claim to have asked Anderson not to kill Burkheimer was unsupported by the testimony of other witnesses. Whitaker contends this statement was misconduct because it shifted the burden of proof. We disagree. The prosecutor merely pointed out that Whitaker's claim contradicted the accounts of other eyewitnesses. The prosecutor also argued that, given the circumstances, merely

asking Anderson not to kill Burkheimer would not be enough to constitute a good faith effort to prevent the commission of the crime. What constituted a good faith effort was a question for the jury, and the prosecutor was entitled to argue what might and might not constitute such an effort. The prosecutor did not commit misconduct.

¶99 Affirmed.

APPELWICK, C.J., and SCHINDLER, J., concur.

Review denied at 159 Wn.2d 1017 (2007).