IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39164-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JAMES THOMAS, III, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — James Thomas III appeals his convictions for assault in the fourth

degree, intimidating a witness, tampering with a witness, and violation of a no contact

order of protection. The victim of all charges was Thomas' girlfriend, G. B. On appeal,

Thomas claims the trial court erred when denying his motion to sever charges, the court

erred under the hearsay rule when it allowed the playing of a recording of a

coconspirator's out-of-court statement, the State violated the confrontation clause when

playing the recording, and insufficient evidence supported a conviction for intimidating a

witness. We affirm all four convictions.

FACTS

This prosecution arises from the relationship between James Thomas, age 45 at the time of the underlying facts in late 2021, and his girlfriend G.B., then age 25. Thomas has two children from a previous relationship: Tyler, then age 27, and Danashia, then age 20.

G.B. bore a daughter, through another relationship, in 2018. At the time of the birth of the daughter, G.B. suffered a methamphetamine addiction. Child Protective Services (CPS) placed the daughter in foster care because medical personnel, at the time of the birth, detected the drug on G.B. CPS returned G.B.'s daughter to her nine months later after G.B. completed rehabilitation.

G.B. and James Thomas met in 2020, at a time when G.B. remained sober. The two dated for two-and-a-half years and lived together. After the two cohabitated, G.B. reengaged in methamphetamine use.

On some unidentified date before October 5, 2021, R.B., G.B.'s mother, overheard James Thomas threatening to furnish CPS with incriminating photographs of G.B. using controlled substances if she ever reported him to law enforcement for assaulting her.

On October 5, 2021, James Thomas confronted G.B. because of his belief that she cheated on him. The two argued. Thomas struck G.B. and walked away. G.B. sustained a bruise to her face. Video captured the assault. G.B. declined to call law enforcement because of her love for Thomas. She soon forgot about the incident because, at the time,

2

she was high on methamphetamine and marijuana. R.B. photographed her daughter's face the following day.

On November 10, 2021, G.B. left James Thomas asleep at their residence as she went to her father's house. When she returned at 8:30 p.m., Thomas confronted G.B. again about her purported cheating. According to a police report, Thomas yelled, slammed G.B. to the ground, and choked her with two hands. Based on the way Thomas eyed her while strangling her, G.B. believed she would die. In self-defense, G.B. flung Thomas from her body with her feet. G.B. attempted to escape, but Thomas stood in the doorway. Thomas eventually allowed G.B. to exit the residence, and she ran outside and called the police. While she was on the phone, Thomas pointed at his cellphone in an attempt to show G.B. something. She could not see what Thomas intended to show her, but concluded that he sought to threaten to show pictures of her to CPS.

Spokane Police Department Officer Brian Blankenstein arrived at James Thomas' and G.B.'s residence thirty to forty-five minutes after G.B.'s call. G.B. presumably had returned to the residence. She shook and struggled to catch her breath. Tears streamed down her face. G.B. repeatedly grabbed her throat. Officer Blankenstein noticed that G.B. suffered from a cold. With the combination of the cold and having been strangled, G.B. encountered difficulty breathing.

During his interview of G.B. on the night of November 10, Officer Brian Blankenstein asked G.B. questions outlined in a "strangulation supplemental" checklist. Report of Proceedings (RP) (July 14, 2022) at 336-37. G.B. responded to the questioning

with complaints of shortness of breath, panting, a headache, and a tingling sensation in her fingertips. G.B. commented that, even after James Thomas released the pressure to her throat, she needed time to regain the ability to comfortably breathe. Officer Blankenstein observed a small amount of petechial hemorrhaging on G.B.'s neck, which he photographed. G.B. admitted she was high on methamphetamine and marijuana that evening.

On the night of November 10, law enforcement officers arrested James Thomas. On the arrest of Thomas, G.B. left the couple's residence and drove to her mother's apartment in a Dodge pickup truck. Thomas purchased the truck but had placed title in both his and G.B.'s names.

At 10:40 p.m. on November 10 and after the arrest of James Thomas, Thomas' son Tyler appeared at G.B.'s mother's apartment in an attempt to remove the pickup truck from G.B. G.B. called 911 again. The call prevented Tyler from appropriating the truck.

At trial, the State played recordings of numerous calls initiated by James Thomas from jail to his daughter Danashia, his son Tyler, and G.B. The conversations formed the basis for the intimidating and tampering with a witness, G.B., and violating the no-contact order. When Thomas began each call, a message warned him that the jail was recording the conversation. The message intoned:

> This call is not private. It will be recorded and may be monitored. If you believe this should be a private call, please hang up and follow facility instructions to register this number as a private number. To consent to this recorded call, press 1. To disconnect press—thank you for using Securus. You may start the conversation now.

4

Clerk's Papers (CP) at 220.

At 10:44 p.m. on November 10, the night of his arrest, James Thomas called, from jail, his daughter, Danashia. During that call, Danashia commented to her father: "I'm calling CPS on her [G.B.] tomorrow. I'm done. I'm dealing with her shit." CP at 223. Thomas then referenced compromising photos of G.B. in connection with Danashia calling CPS.

James Thomas telephoned Danashia a second time on November 10 at 11:06 p.m. The father and daughter discussed the photographs Danashia intended to provide CPS. Thomas remarked that he stored the photographs on his Google account or on his phone, which rested in police custody. Danashia reminded Thomas to complete the paperwork needed to authorize the jail's release to her of the phone.

On November 12, 2021, the superior court entered a protection order prohibiting James Thomas from contacting G.B. Also on November 11, Danashia called CPS and reported G.B.'s lack of care for her daughter.

On a day between November 11 and 15, 2021, Tyler Thomas approached G.B. while she was inside a vehicle. G.B. video recorded the encounter. Tyler tapped on the car window and yelled to G.B.: "they are looking for your daughter." Ex. P9 00:08-00:08. Tyler pointed to his cellphone and told G.B. that he had the phone number for CPS. Ex. P9 00:11-00;15. Tyler added: "You're fucked. You're literally fucked. Do

5

you think you're gonna get me locked up? No. We're gonna pin a record on you." Ex. P9 00;16-00:24. Tyler contacted CPS on November 15, 2021.

On November 16, the State charged James Thomas with felony fourth degree assault predicated on two earlier convictions for domestic violence, second degree assault by strangulation, and unlawful imprisonment, all as domestic violence offenses. Also on November 16, Thomas placed a third call to daughter Danashia. During the call, Danashia reported that she had retrieved her father's phone but could not unlock it because she lacked the password. Thomas disclosed the password. During the November 16 telephone call, with Thomas in jail, Danashia remarked that she had reported G.B. to CPS, and CPS had removed G.B.'s daughter from G.B.

> [DANASHIA]: Um, well [G.B.'s daughter] got taken by CPS last night.
> [MR. THOMAS]: Right now?
> [DANASHIA]: Mm. I said, um, whatcha you want to call it?
> [MR. THOMAS]: Yeah.
> [DANASHIA]: . . . got taken by, um, CPS last night.
> [MR. THOMAS]: What happened?
> [DANASHIA]: Uh, CPS came and got, um, [the daughter].
> [MR. THOMAS]: They came and got her?
> [DANASHIA]: Yeah.
> [MR. THOMAS]: From where?
> [DANASHIA]: Um, her mom's?
> [MR. THOMAS]: From her mom's?
> [DANASHIA]: Yeah.
> [MR. THOMAS]: All right. I mean how—why?
> [DANASHIA]: Because she's just been dropping off her kid with people and just not taking care of her. (Tyler) called CPS. I called CPS. Jenny called CPS. Even her mom called CPS.
> [MR. THOMAS]: Well, cause I know her mom's called CPS (unintelligible).
> [DANASHIA]: Yeah, I know. Yeah, I know. And then that bitch

6

got you put in jail. So I called CPS on the dumb bitch. And so did Tyler.
. . . .
[MR. THOMAS]: . . . what happened?
[DANASHIA]: . . . uh, well I was just telling you that. Um, we haven't seen her. We haven't seen your truck either or whatever. And since, um, you released your keys to me when I do—when I do see your truck, uh, me and Tyler are gonna go try to buy a steering lock and put it on the truck. So she can't take it no more. Cause she's been driving it, and we haven't seen her with the truck in like almost a week now. Or I'd say about like 5 days or whatever.

CP at 241-42 (emphasis added) (some alterations in original).

During the November 16 phone call, James and Danashia Thomas also discussed tracking the truck and taking the truck from G.B.

[MR. THOMAS]: . . . know where the truck's at, huh?
[DANASHIA]: Yeah. We don't know where it's at. And then we don't know where, yeah, we just don't know. Yeah.
[MR. THOMAS]: Well anyway when you turn the phone on, um, hit the letter, you know, you just do the Z. And then, um, basically the—the—the tracking app is—it—it—it say, uh, I think Life 360 or something like that.
[DANASHIA]: Mm-hm. Yeah. I looked—I looked or whatever, and it says she's at the apartment. But I bet you she's not. . . .
. . . .
[DANASHIA]: Well if you write a letter to me and send it to mom's house or whatever. And say I give my daughter permission to take my truck. Then that'll save my ass when I try to take your truck.

CP at 242-45 (some alterations in original).

During the November 16 call, Danashia Thomas told her father that CPS removed G.B.'s daughter from G.B. on November 15. This report was incorrect. CPS attempted to locate the daughter beginning on November 11, when an anonymous caller reported G.B.'s failure to care for the daughter. Danashia called CPS on November 11 such that

7

she may have been the anonymous caller. On November 17, Danashia forwarded, to CPS, photographs of G.B. looking intoxicated and smoking an unidentified substance.

CPS took G.B.'s daughter into custody on November 19, 2021. Danashia and Tyler Thomas assisted CPS in locating the daughter by furnishing phone numbers of people associated with G.B., one of whom then cared for the daughter in her home.

On November 19, James Thomas spoke with both of his children by phone. Thomas confirmed he had mailed a letter authorizing his children to seize the truck from G.B. During the call with Tyler, the father gave Tyler directions to G.B.'s father's home with instructions about taking the truck.

In a November 20, 2021, telephone conversation between James Thomas and his son Tyler, Tyler commented: he "almost punched [the] window out just trying to punch her." He was referring to his confrontation with G.B. on November 15 or earlier while G.B. rode in a car. Ex. P14 (11/16/21) at 3:40. Tyler commented that he had not yet procured the truck. Ex. P14 (11/20/21). Tyler appropriated the truck sometime between November 20 and 23.

James Thomas spoke by jail phone to daughter Danashia on November 23. Danashia declared that if G.B. "wasn't a cop callin' bitch, [she'd] fuckin' dog walk her." CP at 297.

Despite the protection order prohibiting contact, James Thomas spoke with G.B. on the telephone. The jail recorded the conversations.

On November 22, 2021, James Thomas called G.B.'s neighbor, Amber Kaioa, who then summoned "Gina" to the phone. "Gina" was a name contrived for G.B. in an attempt to hide the violation of the protection order. During the November 22 call, Thomas acknowledged the protection order:

> [MS. G.B.]: There's a no contact order we cannot talk so I gotta get off the phone.
> [MR. THOMAS]: Um, that's why I'm talking to Gina right?

CP at 271 (some alterations in original).

> The November 22 conversation with "Gina" continued:
>
> [MR. THOMAS]: Listen to me everything's gonna be okay. I hope.
> [MS. G.B.]: (Unintelligible). I didn't want that.
> [MR. THOMAS]: What? Me arrested?
> [MS. G.B.]: That's 15 years.
> [MR. THOMAS]: Well, I didn't know I was gettin'—gettin' arrested no. . . .
> [MS. G.B.]: Yeah, you hurt me a lot so.
> [MR. THOMAS]: What[?]
> [MS. G.B.]: You hurt me. I wasn't gonna do it anymore.
> [MR. THOMAS]: All right well I have court tomorrow.
> . . . .
> [MR. THOMAS]: I don't think—at this point I'm not getting' out.
> [MS. G.B.]: No, when you get out, I still will be here to talk. . . .
> . . . .
> [MR. THOMAS]: Do you understand if I'm found guilty for this, I'm gonna get 15 years right?

CP at 272-76 (some alterations in original).

James Thomas spoke with "Gina" again on November 23.

> [MS. G.B.]: Did you give them permission?
> [MR. THOMAS]: My kids, for the—to get the truck?
> [MS. G.B.]: Yeah.

9

[MR. THOMAS]: Yes.

[MS. G.B.]: Why would you do that?

. . . .

[MR. THOMAS]: Because I was losing everything.

[MS. G.B.]: I wasn't gonna do that to you?

[MR. THOMAS]: I didn't . . .

[MS. G.B.]: Now, it's hard for me to see my . . . kids. Thank you very much.

. . . .

[MR. THOMAS]: Wait a minute. I don't understand. You don't have your kids?

[MS. G.B.]: They took my kids. They got my kid taken from me. Your kids did this.

. . . .

[MS. G.B.]: Take that permission back, 'cause I (unintelligible).

[MR. THOMAS]: I went to court today.

CP at 279 (some alterations in original).

The November 23 conversation continued:

[MR. THOMAS]: And, um, got a report here from (G.B.), interesting. Uh . . .

. . . .

[MS. G.B.]: Who you talking to? She's . . .

[MR. THOMAS]: I'm talking to you. I'm just telling you that I had gotten a report from, uh—the police report, uh, one from (G.B.), saying that I was trying to kill her.

[MS. G.B.]: You were choking her pretty hard.

[MR. THOMAS]: Any ways. Um, and, then, I got new charges.

[MS. G.B.]: Something about hostage, I think. And I did not
 . . . want that. I didn't. It's just how they took it—what I was saying.

[MR. THOMAS]: What my kids sayin'?

[MS. G.B.]: You wouldn't . . .

. . . .

. . . let her out of the room.

[MR. THOMAS]: Uh, yeah. I don't know.

[MS. G.B.]: You don't remember any of it, because you were . . .

[MR. THOMAS]: I don't remember . . .

10

[MS. G.B.]: . . . too high?

[MR. THOMAS]: . . . any of it.

[MS. G.B.]: You were way too fucked up, and you sound like the guy I, you know, fell in love with. Probably gonna . . .

[MR. THOMAS]: Yeah. I know.

[MS. G.B.]: . . . fuck this (unintelligible).

[MR. THOMAS]: I do you know that—all I know is that earlier that day I took a bunch of—I took a couple of Clonazepams, and I was fucked up.

[MS. G.B.]: Yeah you were, but now my life . . .

[MR. THOMAS]: I don't even remember.

[MS. G.B.]: . . . is fucked up (unintelligible).

CP at 280-81 (some alterations in original).

James Thomas continued the November 23 conversation from jail:

[MR. THOMAS]: I don't know—it's—I mean, the only thing that I can hope for is (G.B.) to drop the statement.

[MS. G.B.]: How?

[MR. THOMAS]: To withdraw the statement. How could she do it?

[MS. G.B.]: Yeah.

[MR. THOMAS]: How can it—or how can the statement be dropped?

[MS. G.B.]: Yeah.

[MR. THOMAS]: The best way to have it done, would be to call my attorney, which you probably don't know who that is yet.

[MS. G.B.]: Well you need to . . .

[MR. THOMAS]: Uh . . .

[MS. G.B.]: . . . get it to where I have the truck, because I can't go anywhere or do anything.

. . . .

[MR. THOMAS]: That's gonna—that's gonna be hard.

CP at 281-82 (some alterations in original).

During the November 23, 2021 telephone conversation, G.B., aka Gina, handed the phone to her neighbor Amber Kaioa, and James Thomas spoke to Kaioa.

[MR. THOMAS]: So, I have what? One, two, three felonies right

11

now.

    [MS. KAIOA]: Yeah.

    [MR THOMAS]: And so, the only thing I can hope for is, like, the— the last two—that I'm not worried about the—the—the . . .

    . . . .

. . . too much on the assault that her mom called in . . .

    [MS. KAIOA]: Uh-huh.

    [MR. THOMAS]: . . . but the other one, the most recent, well, that one it's—it's, um, if one of us can get a hold of (G.B.), and have her call my attorney . . .

    [MS. KAIOA]: Yeah.

    [MR. THOMAS]: . . .and have, uh, her statement, uh, what do you call it, recant? . . .

    . . . .

    [MS. KAIOA]: Where—where—where do I go down to the office— to your attorney and tell her to give 'em a statement?

    [MR. THOMAS]: Well . . .

    [MS. KAIOA]: So they can drop the charge . . .

    [MR. THOMAS]: . . . are you talkin' about . . .

    [MS. KAIOA]: . . .they can drop the charges?  You know?

CP at 283-84 (some alterations in original).

An unidentified male entered the conversation, and James Thomas played attorney with him.  Thomas commented that, if a pummeled girlfriend recants a previous statement that the boyfriend hurt her, the State necessarily must dismiss any charges.

    [MR. THOMAS]: Well, they—if—if she was to recant her statement, yeah.  They were—they would have no choice but to drop the charges.

    . . . .

    [UNKNOWN MALE]: Sure. I can—I can try to talk to her and tell her to do that.

    [MR. THOMAS]: Do what now?

    [UNKNOWN MALE]: I can—I can try to contact (G.B.) and tell her to do that.

    [MR. THOMAS]: Well, I mean, if she—if you—if she can—if (G.B.) was willing to do that, that'd be one thing, but I can't ask you to talk to her.

[UNKNOWN MALE]: Yeah.

[MR. THOMAS]: But if I asked you to talk to her, I mean, that's the explaining of it.

[UNKNOWN MALE]: Yeah, yeah, yeah, yeah. You can't ask, right?

[MR. THOMAS]: But, um, that—so—but right now that's the only thing I can hope for . . .

[MS. KAIOA]: Right.

[MR. THOMAS]: . . . is if, you know—if she rec—if she recants her statement, then, yeah. They will drop all the charges immediately.

[UNKNOWN MALE]: Yeah.

[MS. KAIOA]: Yeah.

[UNKNOWN MALE]: Yeah. I can check see.

[MR. THOMAS]: But, um, trying to . . .

(Unintelligible).

uh, yeah. I'm gonna . . .

[MS. KAIOA]: Because I asked you and . . .

[MR. THOMAS]: . . . ask. I have the report number that she'll need.
. . . .

[MR. THOMAS]: Yeah. This is the report number that she would need.

[MS. KAIOA]: So, say she go in . . .

[MR. THOMAS]: Okay.

[MS. KAIOA]: . . . and talk to the, uh—your attorney then, and redo her statement, and that would be pretty . . .

[MR. THOMAS]: Yeah.

[MS. KAIOA]: . . . important. Wow.

[MR. THOMAS]: Yeah. I can find out who my attorney is and everything tomorrow.

CP at 284-86 (some alterations in original).

G.B., alias Gina, returned to the November 23 telephone conversation:

[MR. THOMAS]: The hard part is going to be trying to get my kids to give up the truck.

[MS. G.B.]: Yeah, because I think that's what they wanted for—ever since you went in. They don't think I can . . .

[t]hat she can take care of it, when she plans on it.

[MR. THOMAS]: Well, I'm worried about it, because, I mean . . .

[MS. G.B.]: Now, listen . . .

13

[MR. THOMAS]: . . .I've lost everything.

CP at 289 (some alterations in original).

James Thomas telephoned to talk to G.B. a third time on November 24, 2021. To make sure that the State would drop charges, Thomas spelled r-e-c-a-n-t for G.B.

[MR. THOMAS]: . . . you are basically—you are calling to confirm (unintelligible) message with them that you're recanting all statements made on November 10.
[MS. G.B.]: 'Kay.
[MR. THOMAS]: You get all that?
[MS. G.B.]: Yeah.
[MR. THOMAS]: (Unintelligible) trying to take notes?
[MS. G.B.]: Yeah.
[MR. THOMAS]: All right. Well, like I said, (unintelligible) say it one more time. . . . She would have to give a birthday. Say, "I'm leaving this message (unintelligible) report number"—give that report number. You know, and all officers involved that you're leaving the message to recant your statement, is what (unintelligible).
[MS. G.B.]: Restate my statement?
[MR. THOMAS]: Recant—R-E-C-A-N-T.
[MS. G.B.]: Recant my statement.
. . . .
[MR. THOMAS]: C-A-N-T. Recant. It's one word. All right? And what that means is anything you said in that report . . .
[MS. G.B.]: All right.
[MR. THOMAS]: . . . uh, no longer valid . . .
[MR. THOMAS]: And then that would be the first—I'm just saying. This would be the first thing that needs to be done. And then the second thing that would need to be done is, well, I mean, you can go down to the courthouse. Um, (unintelligible). But I'm just saying this would be one of the easiest ways . . .
[MS. G.B.]: Yeah.
[MR. THOMAS]: But over the phone, you can pretty much say whatever you want to say, and get off the phone. Because that's all there— there is. It's all recorded. And you call Crime Check.
. . . .
[MR. THOMAS]: And that's pretty much it. No reason—they— they don't ask—say, "Oh. Well, why are you recanting?" "I made a

14

mistake." That's all there is to it. And that's it. That's all they have to know.

CP at 306-08 (some alterations in original).

In a November 28, 2021 fourth call from jail, James Thomas conceded to G.B. that

he had threatened in the past to report her to CPS.

On November 30, James Thomas spoke with his daughter and son about G.B.

recanting and returning the truck to her:

> [TYLER]: All right, man. I—I (unintelligible) help you (unintelligible).
> [DANASHIA]: No, make her write on a fucking piece of paper.
> [MR. THOMAS]: Anyways . . .
> [DANASHIA]: Make her write a fucking contract.
> [MR. THOMAS]: Yes. You can—when—when you give her the keys you can always say, "Hey, look, write out a statement saying that you"—write out a statement that she meets—she's recanting her statement.
> [DANASHIA]: To say that—yeah, I know. And she even sent mom a message saying the only way she's helping you out is if she gets the truck back, so there's also another piece of proof. But . . .

CP at 312-13 (some alterations in original). In the remainder of the call, the three

discussed placing a tracking device in the Dodge pickup truck.

On December 2, 2021, James Thomas spoke with daughter Danashia again:

> [MR. THOMAS]: . . . And then, uh, sent you, um, a letter. Basically, it's not really a letter. It's just a, uh, [an example] on how to write out a statement, or—or do a statement to the police and then, uh, you know, for recanting a statement.
> [DANASHIA]: A what—for what?
> [MR. THOMAS]: All right. Do you know what—you know what recanting means, right?
> [DANASHIA]: No. . . .
> . . . .
> [MR. THOMAS]: All right. Um, for example if I—if I make a

statement to police, um, you know, if I filed a report or whatever on somebody? And then . . .
(Unintelligible).
. . . and then they got somebody or— or, you know, or—or whatever. And they do whatever they're gonna do, file charges or whatever. All right. Well, to—if I want that statement to go away, I would have to recant it. In other words, everything I said, I take it back. Is basically what it means. And then they can't use that statement.
[DANASHIA]: Of what, you saying that she can't drive the truck?
[MR. THOMAS]: No, but it—no, that's—I'm just saying for example. Like, uh, let's say—all right. Let's use [G.B.] for an example. All right. Now, the statement that she made to the police the night that I got arrested, okay? Um, if she was to call crime check and recant her statement, you know, if you—and they would basically have no choice but to drop the charges against me.

CP at 323 (some alterations in original).

Danashia and James Thomas spoke again on December 3. Thomas informed Danashia of an agreement reached whereby Danashia and Tyler would return the pickup truck to G.B. in exchange for her recanting her statement made to police. On December 5, James Thomas called Tyler and spoke to him about the same deal. Pursuant to the agreement, G.B. signed a statement of recantation.

On December 10, 2021, the State of Washington filed additional charges against James Thomas in a cause number separate from the initial charges. The State alleged Thomas had intimidated a witness, tampered with a witness, and violated a no contact order.

James Thomas called Danashia on the afternoon of December 10, 2021.

[MR. THOMAS]: I know that you and Tyler are mad at [G.B.] and everything what's going on.
[DANASHIA]: Okay.

16

[MR. THOMAS]: But you guys can't be bothering her anymore.

. . . .

[DANASHIA]: You realize the only reason . . .

[MR. THOMAS]: And . . .

[DANASHIA]: . . . why we talked to her is because of you?

[MR. THOMAS]: Because these new charges are saying that you guys were like—the—the cops are—whoever talked to [G.B.] and her mom, the cops are making it sound like that I'm having you guys chase her around town, terrorizing her. That's what these new charges are for.

. . . .

[DANASHIA]: . . . The only thing that we did was get your . . .

[MR. THOMAS]: Um . . .

[DANASHIA]: . . . truck back.

. . . .

[DANASHIA]: But then you writing—yeah the rest of it, I'm sure you can think of why else you got that. Because I know me and Tyler, we don't care about her. We don't talk to her. On our own time. The only reason why we talked to her is if we're asked to. And then tampering . . .

[MR. THOMAS]: Yeah.

[DANASHIA]: . . .with a witness, if anything that's—if anything that should fall back on her. Because she said that the only way she's gonna help you out is if, um, she gets the truck back, so. They just know what they're doing. It doesn't even matter anymore because either way you're not looking great.

[MR. THOMAS]: You should just give her truck back.

[DANASHIA]: No, we're definitely not giving her the truck back now. Now, why would we do that? Because obviously she's not helping you out, nothing. She's just making things worse.

[MR. THOMAS]: Actually, no, this is her mom. I'm reading this. And then in the report, in the police reports where actually shows Georgia's trying to drop the charges.

CP at 328-29 (some alterations in original).

PROCEDURE

As previously written, the State of Washington, on November 11, 2021, charged

James Thomas with felony fourth degree assault as a result of his altercation with G.B. on

17

October 4.  The State also charged Thomas with second degree assault by strangulation and unlawful imprisonment as a result of the November 10 confrontation.

On December 10, 2021, the State filed charges, in a separate cause number, against James Thomas based on his phone calls to his son, daughter, and G.B.  The State accused Thomas of the crimes of intimidating a witness, tampering with a witness, and violation of a no contact order.

On May 19, 2022, the State moved, under CrR 4.3(a), to join the two cases for trial.  The superior court granted the motion.

On June 23, 2022, James Thomas moved, pursuant to CrR 4.4(b), to sever charges for purposes of trial.  Thomas sought to place count 2 and count 3 into one trial and the remaining counts, counts 1 and 4-6, into a separate trial.  Counts 2 and 3 related to the assault and unlawful imprisonment on November 10.  Count 1 involved the October 4 assault, while counts 4 through 6 concerned the phone calls.  According to Thomas, the State possessed stronger evidence to support counts 1 and 4 through 6, and the jury should not be swayed by the evidence on those charges when deciding guilt on counts 2 and 3.  Counts 2 and 3 solely relied on G.B.'s testimony.  Thomas emphasized that the evidence favoring counts 1 and 4 through 6 would not be admissible in a trial solely on counts 2 and 3 and a limiting instruction directing the jury to ignore the evidence for purposes of some counts while considering the evidence for other counts would not cure the prejudice.  Presenting all charges in one trial presented Thomas with the quandary of

18

whether to testify with regard to counts 2 and 3. In the alternative, Thomas asked for severing the fourth degree assault from the remaining charges for purposes of trial.

The trial court denied James Thomas' motion to sever. The trial court highlighted that the counts involved the same victim and defendant, the tampering and witness intimidation charges arose from the assault charges, probable cause existed for each charge, the State tendered strong evidence of all charges, Thomas had filed no *Knapstad* motion, all evidence of one charge would be cross-admissible on the other charges, the jury would be instructed to consider each count separately, and juries sometimes return guilty verdicts on some counts while rendering acquittals on others.

Before trial, the State moved to admit and play the jail calls that James Thomas initiated to his children, G.B., and Amber Kaio. The State argued Danashia's statements were admissible as coconspirator statements. According to the State, Thomas and his two children conspired to take the Dodge truck and to return the truck to G.B. only if she recanted. The trio also plotted to intimidate G.B. to recant by reporting her to CPS.

James Thomas objected to the playing of the recorded phone calls with Tyler and Danashia Thomas. According to Thomas, the coconspirator hearsay exception did not apply because the State could not prove, independent of the phone calls, a conspiracy. The defense also claimed the jail calls were testimonial because of the warning of the recording at the beginning of the calls, a State agency recorded the calls, and the State sought to use the calls as substantive evidence at trial. Thomas contended the calls, as

19

testimonial statements, were not admissible under the confrontation clause unless Danashia testified.

The trial court granted the State's motion to admit the jail calls between Danashia and James Thomas. The court reasoned that the calls were not testimonial and the State held sufficient evidence independent of the calls to find that Danashia was a coconspirator.

Danashia Thomas did not testify. James Thomas did not renew his motion to sever during the course or at the end of trial.

The jury found James Thomas guilty of felony fourth degree assault for the October 4 altercation, intimidation of a witness, tampering with a witness, and violation of the no contact order. The jury acquitted Thomas of second degree assault and unlawful imprisonment based on the November 10 confrontation. The jury returned special verdicts finding Thomas and G.B. were intimate partners and that each of the crimes of which he was found guilty qualified as aggravated domestic violence offenses, based on the thirteen earlier convictions for domestic violence.

## LAW AND ANALYSIS

On appeal, James Thomas claims the trial court erred when denying his motion to sever charges, the court erred under the hearsay rule when allowing the playing of a recording of a coconspirator's out-of-court statement, the State violated the confrontation clause when playing the recording, and insufficient evidence supported a conviction for intimidating a witness. We reject each assignment of error.

Severance

On appeal, James Thomas renews his contention that the superior court should have severed counts two and three, the assault and false imprisonment on November 10, from counts one, assault on October 4, and four through six, violation of a no-contact order and witness interference, for purposes of trial. Thomas contends that the strength of the State's evidence supporting the charges varied from one count to another. According to Thomas, the State possessed weaker evidence on counts two and three because his accuser, G.B., only witnessed the attack. He maintains that his defenses from one set of charges to another were inconsistent and the limiting jury instruction did not cure the prejudice.

We question characterizing the evidence for the November 10 assault as weaker when the police responded to the November 10 confrontation and noticed injuries to G.B. and when no third party witnessed the October 4 altercation. But James Thomas correctly predicted the strength of the evidence of the respective charges because the jury acquitted him of counts two and three, which counts he wanted severed from the other counts. So, the principal prejudice that Thomas feared did not materialize.

The State responds that the trial court did not abuse its discretion when denying the motion to sever. The State also contends that James Thomas waived any right to severance by failing to renew the motion during trial. Thomas does not respond to the State's waiver contention. We agree with the State's waiver argument. Therefore, we do not address the merits of Thomas' assignment of error.

21

CrR 4.4(a) controls a criminal defendant's motion to sever charges for trial. The rule reads with regard to waiver:

> Timeliness of Motion—Waiver.
> (1) A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. Severance is waived if the motion is not made at the appropriate time.
> (2) If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence. *Severance is waived by failure to renew the motion.*

(Emphasis added) (boldface omitted).

The law does not favor separate trials. *State v. Huynh*, 175 Wn. App. 896, 908, 307 P.3d 788 (2013). Nevertheless, on motion of a defendant, the trial court shall grant severance if the court "determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). The defendant bears the burden of showing severance is necessary. *State v. Emery*, 174 Wn.2d 741, 752, 278 P.3d 653 (2012).

If the trial court overrules a defendant's pretrial motion for severance, the accused may renew the motion before or at the close of all the evidence. CrR 4.4(a)(2). A defendant waives the severance issue if he or she fails to properly renew the motion at trial. CrR 4.4(a)(2); *State v. Emery*, 174 Wn.2d 741, 754 (2012); *State v. McDaniel*, 155 Wn. App. 829, 859, 230 P.3d 245 (2010). When a court considers a pretrial motion to sever, the court considers the potential for prejudice based on the expected evidence. The law requires a renewal by the end of the testimony in order to give the court an

opportunity to assess actual prejudice based on the evidence presented. *State v. McCabe*, 26 Wn. App. 2d 86, 95, 526 P.3d 891, *review denied*, 1 Wn.3d 1032, 534 P.3d 806 (2023); 5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 17.3(d) at 58 (4th ed. 2015).

Admissibility of Phone Call Recordings

James Thomas next assigns error to the trial court's allowing the State to play the recording of his calls to his daughter Danashia. He does not challenge the playing of the recordings of calls to his son Tyler, Amber Kaioa, G.B., or Gina. In challenging the playing of the Danashia calls, he relies on both evidentiary rules and his constitutional right to confront witnesses. We address the rulatory argument first.

James Thomas argues that Danashia's recorded comments constituted hearsay and no hearsay exception applies. Nevertheless, the evidence rules remove from the definition of "hearsay" statements of coconspirators. ER 801 declares:

> (d) Statements Which Are Not Hearsay. A statement is not hearsay if—
> . . . .
> (2) *Admission by Party-Opponent*. The statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

 (Boldface omitted.)

Statements made in the course and furtherance of a conspiracy, by coconspirators, do not qualify as hearsay. *State v. Palomo*, 113 Wn.2d 789, 783 P.2d 575 (1989). Before admitting a coconspirator statement, the trial court must independent of the statement

determine that (1) a conspiracy existed, and (2) the defendant was a member of the conspiracy. *State v. Whitaker*, 133 Wn. App. 199, 222, 135 P.3d 923 (2006). Under ER 801(d)(2)(v), the State must establish by a preponderance of the evidence a conspiracy, namely an agreement by two or more persons confederating to do an unlawful act. *State v. Halley*, 77 Wn. App. 149, 154, 890 P.2d 511 (1995). The defendant must have participated in "a concert of action, all the parties working together understandingly with a single design for the accomplishment of a common purpose." *State v. Whitaker*, 133 Wn. App. 199, 223 (2006). The conspiracy need not be a formal agreement. *State v. Sanchez-Guillen*, 135 Wn. App. 636, 643, 145 P.3d 406 (2006).

A conspiracy may be shown by circumstantial evidence. *State v. Whitaker*, 133 Wn. App. 199, 223 (2006). When assessing the needed evidence to find a conspiracy by a preponderance of evidence, the trial court may rely on evidence otherwise inadmissible before the jury. *State v Guloy*, 104 Wn.2d 412, 420, 705 P.2d 1182 (1985). We review the admissibility of coconspirator statements for an abuse of discretion. *State v. Whitaker*, 133 Wn. App. 199, 223 (2006).

The State charged James Thomas with intimidating G.B. through his two children. According to the State, the three worked in concert to report her conduct to CPS if she did not withdraw the charges against him. The trio also applied pressure on her to recant by withholding possession of the truck until she did so. The State not only intended to prove the crime by the recorded statements of Danashia Thomas, but recorded statements among James Thomas, Tyler Thomas, Amber Kaioa, and G.B.

24

James Thomas argues that, under the independent source rule, the State remained barred from introducing Danaisha's statements during the phone calls. Thomas' argument, however, does not recognize that Thomas himself also uttered inculpatory words during the phone conversations and conversations with G.B. and Tyler and that those words confirmed an agreement to intimidate G.B. as a witness.

James Thomas impliedly concedes that the State may employ, when establishing a conspiracy, his own comments uttered to Danashia during the phone calls. Nevertheless, Thomas contends that his remarks to Danashia did not establish that he asked Danashia to threaten G.B. with calling CPS unless she dropped charges. According to Thomas, the calls showed that Danashia decided on her own to threaten G.B. and to call CPS. According to Thomas, the worst that can be drawn from the phone calls is that he failed to dissuade Danashia from contacting CPS, facts short of proving by a preponderance of evidence an agreement or a concert of action.

Ample evidence outside of Danaisha's comments, including James Thomas' own comments during the calls, supported the trial court's finding, for purposes of ER 801(d)(2)(v), of a conspiracy. During the November 10 calls between James Thomas uttered comments that confirmed a concert of action in supplying photos of G.B. to CPS. The father told his daughter that he stored the photos on his Google account and identified how Danashia may access the pictures. Thomas also told his daughter that he would release his phone to her from his jail property so that she could access the compromising photos.

25

During the November 16 call between Danashia and James Thomas, Thomas gave Danashia the password to his cellphone so that Danashia could unlock photos of G.B. Thomas' own words implicated him with directing concerted action to harm G.B. CPS confirmed that it received the compromising photographs after Danashia and Thomas' conversation.

During the November 28, 2021 call to Amber Kaioa and G.B., Thomas informed G.B. that he would direct Tyler to return the truck with her cooperation in recanting. Thomas mentioned that Danashia told him G.B. would not help him get out of jail if the children failed to return the pickup. Georgia lamented CPS removing her daughter. Thomas lied about knowledge that his children shared photographs with CPS. But Thomas conceded to G.B. that he, in the past, had shared the photographs with others. Thomas admitted he had also earlier threatened to report G.B. to CPS. Thus, Thomas' own words showed a motive to report G.B. to CPS and coincided with his conversation with Danashia about how Danashia can gain access to the photographs.

James Thomas wrote a letter giving Danashia and Tyler Thomas permission to remove the truck from G.B.'s possession. This letter confirmed concerted action to interfere in G.B.'s access to transportation unless she recanted.

In a December 3, 2021 telephone conversation with Danashia, James Thomas commented on an agreement whereby his children would return the pickup truck to G.B. if she recanted her accusations against him. In a December 5 call to Tyler Thomas, Thomas instructed Tyler to relinquish the truck to G.B. if she recanted.

26

James Thomas told Tyler and Danashia to return the truck when G.B. signed a written statement recanting.  Thomas confirmed he desired this plan.  As a result, G.B. attempted to recant.

## Confrontation Clause

James Thomas also challenges the introduction of Danaisha's comments on the recorded jail calls based on the United States Constitution's confrontation clause. Because Danashia did not testify, Thomas could not cross-examine her about those out-of-court statements.  We reject the contention.

Both the federal and state constitutions afford an accused the right to face witnesses presenting evidence against him or her.  The United States Constitution declares:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be *confronted* with the witnesses against him.

U.S. CONST. amend. VI (emphasis added).  The United States Supreme Court incorporated Sixth Amendment protections to apply to state prosecutions under the due process clause of the Fourteenth Amendment.  *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).

Under the state constitution,

> [i]n criminal prosecutions the accused shall have the right to . . . meet the witnesses against him *face to face*.

WASH. CONST. art. I, § 22 (amendment 10) (emphasis added). RCW 10.52.060 confirms the right of every person accused of a crime "to meet the witnesses produced against him or her face to face."

According to the United States Supreme Court, the confrontation clause ensures the reliability of evidence against a criminal defendant by subjecting the evidence to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). The word "confront," after all, means a clashing of forces or ideas, thus manifesting the notion of adversariness. *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The confrontation clause also serves the symbolic goals of fairness and reliability in a prosecution. *Lee v. Illinois*, 476 U.S. 530, 540, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986).

The accused deserves the opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him or her to stand face to face with jurors so that jurors may look at the witness and judge by the witness' demeanor on the stand and manner of testimony whether the witness deserves belief. *Mattox v. United States*, 156 U.S. 237, 242-243, 15 S. Ct. 337, 39 L. Ed. 409 (1895). In light of these considerations, the confrontation clause demands a witness be placed under oath, cross-examined, and subjected to observation of demeanor by the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 851 (1990).

According to the United States Supreme Court, face-to-face confrontation forms the core value furthered by the constitutional confrontation right. *Maryland v. Craig*, 497

28

U.S. 836, 847 (1990). Thus, the confrontation clause prefers a face-to-face confrontation during trial. *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Nevertheless, the right to face-to-face confrontation between the accused and witnesses is not an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers. *Maryland v. Craig*, 497 U.S. 836, 849-50 (1990). A literal reading of the confrontation clause would abrogate hearsay exceptions, a result deemed extreme. *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). Considerations of public policy and necessities of the case, in narrow circumstances, may preempt the right of a physical face-to-face encounter. *Maryland v. Craig*, 497 U.S. 386 (1990).

We assume that Danashia Thomas did not testify at her father's trial because her testimony could implicate her in the crimes of intimidating and tampering with a witness, if not also aiding in the violation of a no-contact order. The Fifth Amendment provides one the right against self-incrimination. U.S. CONST. amend. V. Sometimes this right and the confrontation right create tension when the State seeks introduction of a statement of a coconspirator. A conflict arises when a coconspirator mouths a statement outside of court that implicates the defendant and then the coconspirator refuses to testify. The accused lacks the opportunity to cross-examine the actual speaker of the out-of-court statement.

The United States Supreme Court addressed this conflict in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The Court found that the

admission of an out-of-court statement by a nontestifying codefendant violated the defendant's confrontation right. The government prosecuted Bruton and a man named Evans jointly for an armed postal robbery. Before trial, a postal inspector interrogated Evans in jail. Evans confessed to the crime and implicated Bruton. At trial, Evans did not take the stand but the postal inspector testified that Evans confessed to committing the crime with Bruton. The trial court instructed the jury to disregard the confession as to Bruton's guilt or innocence. The jury convicted Bruton. The Court reversed, holding that the use of Evans' confession violated Bruton's confrontation right, even with the limiting instruction. It reasoned that Evans' confession added "critical" weight to the case against Bruton, in a form that was not subject to cross-examination.

The United States Supreme Court has since refined its confrontation clause jurisprudence by limiting its scope to testimonial statements. In 2004, the Supreme Court effectively changed the landscape of its confrontation clause analysis in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the Court considered the admission of an out-of-court recorded statement made to police against Crawford and held that the confrontation clause barred its admission because the statement was "testimonial." The Court examined the historical lineage of the defendant's right to prior cross-examination of an unavailable witness presented against him. Based on a textual approach, it reasoned that the confrontation clause applies to "witnesses" against the accused, that is those who "bear testimony." 541 U.S. 36, 51

(2004). Thus, the Supreme Court concluded that the confrontation clause was primarily

concerned with testimonial statements.

In *Davis v. Washington*, 547 U.S. 813, 821-24, 126 S. Ct. 2266, 165 L. Ed. 2d 224

(2006), the Supreme Court distinguished *Crawford* when ruling that "nontestimonial

statements" fall outside of the rubric of the Confrontation Clause. Only testimonial

statements render the out-of-court declarant to be a "witness" within the meaning of the

confrontation clause. The Court held the confrontation clause permits nontestimonial

statements regardless of a lack indicia of reliability. Only after a court concludes that a

given statement is testimonial should the court proceed to analyze the confrontation

clause.

*Crawford* and *Davis* advised generally on how to assess whether a statement is

testimonial. When the statement is functionally trial testimony, it is testimonial. A

testimonial statement seeks to establish or prove some past fact or is a weaker substitute

for live testimony at trial. *Davis v. Washington*, 547 U.S. 813 (2006). When the out-of-

court declaration is just a casual statement made to a friend, it is nontestimonial.

*Crawford v. Washington*, 541 U.S. 36, 51 (2004).

In *Crawford v. Washington*, the United States Supreme Court gave examples of

testimonial statements:

> Various formulations of this core class of "testimonial" statements
> exist: "*ex parte* in-court testimony or its functional equivalent—that is,
> material such as affidavits, custodial examinations, prior testimony that the
> defendant was unable to cross-examine, or similar pretrial statements that
> declarants would reasonably expect to be used prosecutorially";

31

"extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ."

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.

*Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (citations omitted).

James Thomas categorizes Danashia's phone comments as testimonial statements due to the automated warning at the beginning of each jail call informing the caller that the call would be recorded and monitored. As such, according to Thomas, the recorded statements substituted for in-court testimony. He recognizes that no case law adopts his contention.

One court has adjudged jail house calls to be nontestimonial statements even with warnings of the calls being recorded. *United States v. Castro-Davis*, 612 F.3d 53, 65 (1st Cir. 2010). Jailhouse calls are not statements to a police officer, during the course of an interrogation, nor in a structured setting designed to elicit responses intended to be used in court. *United States v. Castro-Davis*, 612 F.3d 53, 65 (1st Cir. 2010). The conversants during the call generally do not wish to have the conversation repeated in court. Another court ruled that comments made to loved ones or acquaintances are not the kind of memorialized evidence created by the judicial process and thus are not deemed testimonial. *United States v. Manfre*, 368 F.3d 832, 838 n.1(8th Cir. 2004).

Often the declarant of the out-of-court statement knows that the statement can or will be used in a legal proceeding. This knowledge presumably renders the utterances

testimonial in nature. This appeal concerns out-of-court statement of Danashia Thomas. The record does not disclose whether Danashia knew that the jail recorded the conversations with her father. James Thomas may have only heard the warning. The State does not argue that Danashia never heard the warning.

Insufficient Evidence – Intimidating a Witness

The jury convicted James Thomas with intimidating a witness. On appeal, Thomas challenges the sufficiency of evidence for the conviction.

RCW 9A.72.110 defines intimidation of a witness, in part:

> (1) A person is guilty of intimidating a witness if a person, by use of a threat against a current or prospective witness, attempts to:
> (a) Influence the testimony of that person;
> (b) Induce that person to elude legal process summoning him or her to testify;
> (c) Induce that person to absent himself or herself from such proceedings; or
> . . . .
> (3) As used in this section:
> (a) "Threat" means:
> (i) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or
> (ii) Threat as defined in RCW 9A.04.110(27).
> (b) "Current or prospective witness" means:
> (i) A person endorsed as a witness in an official proceeding;
> (ii) A person whom the actor believes may be called as a witness in any official proceeding; or
> . . . .
> (5) For purposes of this section, each instance of an attempt to intimidate a witness constitutes a separate offense.

The legislature amended RCW 9A.04.110 in 2011 c 166 § 2 by changing subsection (27) to subsection (28). RCW 9A.04.110(28) declares:

33

"Threat" means to communicate, directly or indirectly the intent:

. . . .

(e) To expose a secret or publicize an asserted fact, whether true or false, tending to subject any person to hatred, contempt, or ridicule; or

(f) To reveal any information sought to be concealed by the person threatened; or

. . . .

(j) To do any other act which is intended to harm substantially the person threatened or another with respect to his or her health, safety, business, financial condition, or personal relationships;

A claim of insufficiency admits the truth of the State's evidence and all inferences reasonably drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence carry equal weight. *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016). Reviewing courts give deference to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Trey M.*, 186 Wn.2d 884, 905 (2016).

James Thomas contends that, even when admitting the truth of the State's abundant evidence, the evidence fell short of convicting him of intimidating G.B. to recant her statement about the assault and unlawful imprisonment. According to Thomas, the State presented no evidence that he threatened to call CPS on G.B. for her drug use if she did not repudiate her allegations to the police. Thomas mentions a statement he uttered to his daughter Danashia about retrieving photographs from his cell phone, but he maintains that the conversation never identified the photographs or how Danashia would employ the pictures. The recorded call, according to Thomas, also evidenced no direction from Thomas to his daughter to harm G.B. Instead, Danashia initiated the topic

of G.B. In short, during the telephone conversations, Thomas, as the argument proceeds, never solicited or sanctioned threats by Danashia.

We disagree with James Thomas and conclude that ample direct and circumstantial evidence supported a finding of intimidating a witness. The State presented evidence that Thomas knew G.B. had previously lost custody of her daughter due to her substance use. G.B. had recently relapsed in methamphetamine use. Thomas stored photographs of G.B. using substances on his phone. Before the October 5 altercation, G.B.'s mother overheard Thomas threatening G.B. with furnishing CPS those photos if she reported him to law enforcement. The photographs revealed embarrassing information and endangered G.B.'s relationship with her daughter.

James Thomas admitted in a call to G.B. that he had threatened to call CPS in the past. In the context of this conversation soliciting a recantation, a jury could reasonably conclude that Thomas' reminder to G.B. of his past conduct impliedly threatened to report her again if she did not cooperate.

After the assault on November 10, James Thomas pointed to his phone while G.B. called 911. G.B. concluded that Thomas intended to threaten her by distributing photographs of her.

Later on November 10, James Thomas spoke with his daughter and offered up the photographs after Danashia expressed a desire to call CPS. This phone call occurred as G.B. called 911 because Thomas' son chased her. Thomas thereafter released his phone

35

to Danashia. During a later phone call, Thomas disclosed his password to Danashia so she could unlock the photographs.

Several days later, Tyler Thomas confronted G.B. in her car. In fulfillment of the adage of like father like son, Tyler pointed to his phone while impliedly threatening to call CPS. Tyler, Danashia, and James Thomas consummated their conspiracy when fulfilling the threat to disclose photographs to CPS. Thereafter, in an attempt to regain the pickup truck, G.B. wrote a retraction.

James Thomas suggests the State must show an overt, threatening, action made by the defendant toward a testifying witness. Nevertheless, RCW 9A.72.110 does not limit a qualifying threat to an overt threat. Nor need the defendant utter the threat directly to the victim. Instead, RCW 9A.72.110(3)(a)(i) and RCW 9A.04.110(28) reference an indirect communication.

The term "threaten" can include all threats, whether or not verbalized. *State v. Pinkney*, 2 Wn. App. 2d 574, 579, 411 P.3d 406 (2018). A person may direct a threat and thereby intimate a witness without that threat being communicated to the threat's target; the threat may be transmitted to a third party. *State v. Ozuna*, 184 Wn. 2d 238, 247, 359 P.3d 739 (2015).

## CONCLUSION

We affirm James Thomas's convictions for assault in the fourth degree, intimidating a witness, tampering with a witness, and violation of a no contact order of protection.

36

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:


_____
Lawrence-Berrey, C.J.

_____
Staab, J.